WILLLIAM NORMAN ET AL., APPELLEES, V. WILLIAM T. KUSEL, APPELLANT.

FILED DECEMBER 18, 1914.   No. 17,924.

1. **Waters: OBSTRUCTION OF STREAM: RIGHT TO USE OF WATER.** One whose premises are situated on a stream of water will not be permitted to obstruct the natural flow of the stream in such a manner as to deprive another, who is rightfully in possession of a tract of land situated on the stream below, of water for domestic use, including water for his stock, unless such use will deprive the upper proprietor of water necessary for his own use.

2. ——: ——: ——. Where the testimony clearly shows that the upper proprietor has obstructed the flow of the stream in such a manner as to wilfully deprive another of the use of water for the purposes above mentioned, and that the upper proprietor had no use for the water for irrigation or other purposes, he will be liable for all the damages occasioned thereby. The question of riparian rights does not arise in such a case.

3. **Appeal: AFFIRMANCE.** Where plaintiffs' claim for damages and defendant's counter-claim for trespass by plaintiffs' cattle are submitted to the jury under proper instructions, the verdict will not be set aside, unless, upon the whole record, it appears to be clearly wrong.

4. **Instructions** examined, and found to contain no reversible error.

APPEAL from the district court for Dawes county: WILLIAM H. WESTOVER, JUDGE. *Affirmed.*

*A. W. Crites* and *Dolezal & Johnson,* for appellant.

*Earl McDowell* and *Burkett, Wilson & Brown, contra.*

BARNES, J.

Action in the district court for Dawes county for damages alleged to have accrued to plaintiffs by depriving their cattle of water during the month of August, 1911.

The plaintiffs alleged, in substance, that they leased the southeast quarter of section 4, township 32, range 51 west, in said county, for the purpose of pasturing their cattle thereon; that a stream of water, called Little Cotton Wood

creek, ran through a corner of said tract of land, and afforded a sufficient amount of running water to supply plaintiffs' cattle, but for the wrongful acts of the defendant; that defendant owned a tract of land through which the Little Cotton Wood creek ran adjoining plaintiffs' land, which was situated up the stream from the plaintiffs' pasture; that defendant had constructed a dam in the said creek, on his own land, and had used some water out of the stream for the purpose of irrigation; that, as soon as plaintiffs turned their cattle into the pasture above mentioned, the defendant notified them to take them away, and put a slushboard on his dam, opened the headgate to his irrigation ditch, and entirely stopped the flow of the stream through plaintiffs' pasture, thereby depriving their cattle of water; that they were compelled to, and did, put up a windmill and tank, and constructed a well for the purpose of watering their stock; that, before they could complete their improvement and provide water for their stock, their cattle suffered for the want thereof, and fell off in weight and condition, to their damage in the sum of $2,160, for which they prayed judgment.

The defendant, by his answer, alleged that he had a lease on the southeast quarter of section 4, township 32, range 51 west, and that plaintiffs were trespassers thereon. Defendant denied the allegations of the petition, and set up a claim of right to the water taken by him. Defendant made a counter-claim of $250 for damages to his crop of hay, alfalfa and corn by the plaintiffs' cattle, which he alleged had trespassed on his premises. The allegations of the answer were denied by a reply. The cause was tried to a jury, and a verdict was rendered for plaintiffs for the sum of $397.50. A motion for a new trial was overruled, judgment was rendered on the verdict, and the defendant has appealed.

The appellant, by his brief, has presented the following questions for the consideration of the court: First. Is the verdict supported by the evidence? Second. Did the court err in his instructions to the jury?

97 Neb. 26

As to the first assignment of error, the evidence discloses that plaintiffs produced a lease of the premises in question from the owner thereof, duly executed, which was introduced in evidence. The defendant, on this question, failed to introduce any testimony showing, or tending to show, that he had any right to the possession of the land in question. The testimony shows, that, acting under their lease, the plaintiffs commenced to turn their stock into the pasture about the first days of August, 1911, and by the middle of August had placed about 309 head of cattle therein; that at the time they turned their cattle into the pasture there was a sufficient amount of water flowing through the creek to supply their stock. As soon as defendant discovered that plaintiffs had turned the stock into the pasture, he nailed a slushboard on his dam, opened up the headgate to his irrigation ditch, and entirely stopped the flow of water in the stream through the plaintiffs' pasture. It appears that, when the flow of water in the stream through the pasture stopped, one of the plaintiffs went up to the defendant's dam and examined the condition of it. He testified that the slushboard was on the dam and was banked up with dirt; that he examined the head of water at the headgate of the defendant's irrigation ditch, which he found was opened, and the depth of water running through the ditch at that time was at least eight inches; that the water flowed out into the defendant's meadow and away from the creek; that there was practically no water flowing down the creek below the defendant's dam; that there was a little seepage through the dam, which was scarcely enough to be noticed; that this condition continued from about the 12th day of August until the 2d day of September; that during the meantime plaintiffs' cattle were simply famishing for want of water; that they broke through the fences, and would go tearing all around the pasture trying to get out; that plaintiffs then started to put in a windmill to supply water for the cattle, but it took ten days before they could get it in operation. During that time the cattle occasionally broke through the fences, and plaintiffs had

to repair them; that·they were obliged to keep a watch upon the cattle day and night; that after the water was restored they had no further trouble; that they expended in constructing the windmill at least $200; that they had plenty of water after the improvement was completed, which was on the 2d day of September.  It appears from the testimony that the slushboard was pounded down on defendant's dam so tight that no water could go through, except just the·natural seepage; that the water was all running through the headgate to his irrigation ditch; that at that time defendant's crop was all made, and he had nothing to irrigate.

As to the condition of plaintiffs' cattle, the testimony shows that they had shrunk in weight;·that they were just milling around the pasture all the time; and that they shrank from 65 to 75 pounds a head.  The testimony also shows that plaintiffs complained to the state board of irrigation that the defendant was depriving them of water for their stock; that Mr. Francis, an assistant to the state engineer, and Mr. Cripps, a man he sometimes employed to do the work for him when he could not do it himself, went·to the defendant's dam and lifted the slushboard so as to let the water flow down the channel of the stream, and adjusted the defendant's headgate to his irrigation ditch; that plaintiffs again complained, and the assistant engineer again visited the defendant's dam and found the slushboard nailed down and banked up with dirt, and that all the water was going through defendant's irrigation ditch; that he again raised the slushboard and adjusted the headgate.  The testimony shows that before defendant nailed down the slushboard on his dam there was a good steady flow of water down the stream, sufficient for domestic use, and to supply water for the use of plaintiffs' cattle.  The testimony also shows that the defendant was seen frequently at his dam with a shovel on his back.

Mr. Francis testified, in substance,.that he was superintendent of the district where the defendant's dam was situated; that he was at the headgate of the defendant's irrigation project; that the defendant had a dam in the

creek, and had a box running out into the pond above his dam; that there was very little water going through the dam; that he told the defendant that the water was needed for domestic purposes, and he must put up a headgate that the witness could regulate; that defendant had a dam to begin with, and on top of the dam he had a slushboard so as to raise it and turn the volume of water into his irrigation ditch; that witness pried off the slushboard, but that he could not shut the defendant's headgate, and he therefore filled it with dirt so that he could turn some water down the creek; that his assistant, Mr. Cripps, was with him the second time when he visited the defendant's dam. Several witnesses testified as to the condition of the plaintiffs' cattle, and placed the shrinkage as high as 70 pounds a head.

Without further discussion of the evidence, it is sufficient to say that plaintiffs' cattle were damaged by being deprived of water during the month of August to a large amount.

The defendant, by his evidence, failed to deny any of the material facts testified to by plaintiffs' witnesses, and introduced no evidence showing, or tending to show, any right on his part to maintain the slushboard on his dam, and thus turn the water into his irrigation ditch and deprive the plaintiffs of a sufficient amount of water to supply their stock. In fact, the defendant admitted that his crop was all made at the time, and he had no use for the water for irrigation purposes.

The plaintiffs admitted that their cattle had trespassed upon the defendant's premises, and damaged him to some extent. The testimony as to the amount of damages varied from $79, as testified to by disinterested witnesses, up to $250, according to the defendant's own testimony. The questions as to the amount of plaintiffs' damages and as to the defendant's counter-claim were properly submitted to the jury. It appears that plaintiffs' cattle fell off from 50 to 75 pounds a head, and that the market value of the cattle was from 4 to 5 cents a pound, and the damage for that item alone was about $800. Giving the defendant

the benefit of the total amount of his claim, which was $250, it cannot be said that the evidence did not sustain the verdict, or that the amount of the verdict was excessive.

It is contended that the court erred in giving certain instructions to the jury upon his own motion, to wit, Nos. 4, 5, and 7. Instructions numbered 4 and 5 the appellant discussed together in his brief. By instructions 4 and 5 the jury were told, in substance, that if the defendant wrongfully and purposely diverted the water from Little Cotton Wood creek to such an extent that plaintiffs' live stock were deprived of sufficient water for their maintenance, and if defendant diverted the water from said stream and refused or neglected to permit sufficient water to flow down the channel of the stream to water plaintiffs' stock, then he would be liable for any damages which might result by reason thereof. It is insisted that these instructions were clearly wrong. It is argued that plaintiffs were not the owners of the quarter section through which the stream flowed, and were owners of large tracts of adjoining land; that they pastured 309 head of cattle upon this land, and that all of the 309 head of cattle obtained water at the watering place on the 160-acre tract, and it is insisted that plaintiffs had a right to water not to exceed 8 or 9 head of cattle, because those were all the cattle which the 160 acres of pasture would support that season; that by the instructions the court set at naught the rights of the defendant, and granted to the plaintiffs a greater right than was warranted by the law of riparian rights.

As we view the record, that question was not involved in this controversy. The defendant, by his testimony, made no claim that, by allowing the water to flow down the stream to the plaintiffs' watering place, he would be deprived of the use of the water to any extent whatever. On the other hand, he testified that he had no use for the water, because the irrigation season had terminated. This being true, no riparian right was in any manner involved in this controversy. The testimony shows that, if the defendant had not wrongfully interfered with the flow of the stream,

there would have been a sufficient amount of water to supply all of the plaintiffs' stock, and therefore the court did not err in giving the instructions complained of.

By instruction No. 7 the jury were told, as a matter of law, that on and after the 9th day of August, 1911, the defendant had no valid lease of the quarter section of land in question, and was not entitled to the possession and control of the same as against the plaintiffs. It is contended that this instruction was erroneous, because there was a conflict in the evidence upon this question. As we view the record, there was no conflict which would require a different instruction. The plaintiffs had a lease, properly executed, for the land, and all that the defendant's testimony shows is that he had been given an agency to lease the land, and that he had not leased the land to any one.

As we view the record, it contains no reversible error, and the judgment of the district court is

AFFIRMED.

LETTON, ROSE and FAWCETT, JJ., not sitting.